BOARDMAN, Acting Chief Judge.
Milton Brinkley Payne, Jr. appeals his conviction and sentence for attempted sale of marijuana. We reverse.
Appellant and codefendants Joe Clyde Hudson and John Frederick Payne, appellant’s brother, (hereinafter “Payne”) were charged by information with possession of more than twenty grams of marijuana and sale of marijuana. Appellant was tried by jury, acquitted on the possession charge, and convicted on the lesser included offense *1298 of attempted sale of marijuana on the sale charge. He was sentenced to one year in prison. This appeal followed timely.
Jack Montgomery, an undercover detective, testified that pursuant to discussions between him and Payne in August, 1980, and Montgomery’s intervening purchase from Payne of one pound of marijuana and a gram of cocaine, the two met again on March 17, 1981, and discussed a larger transaction. Montgomery met Payne at the Happy Times Bar in Seminole, Florida. Montgomery asked if he could purchase a larger quantity of marijuana, and Payne said he could do it right then. Montgomery said he would first have to talk to his money man about doing a larger deal, and he accompanied Payne outside, where he introduced Detective Ward as his money man. The three drove to Seminole Boulevard and Park Boulevard, where Payne announced that the marijuana was in a garage within a quarter mile radius of that area. Ward asked if he could have a sample prior to the transaction. Payne said he would get them a sample the following morning.
Montgomery called Payne the next day at 8:30 a.m. Payne told Montgomery to pick him up at the Pinch-a-Penny Pool Supply business, which was located directly behind his house. Montgomery did so, and they drove to a residence at 11215 102nd Street. Payne had Montgomery stop in front of the house, while Payne went inside for a few minutes and came back with a baggie of marijuana, which he handed to Montgomery. As they drove away, Payne said he had already contacted his connection, or source, his brother Topper (appellant), about the larger purchase of marijuana. Montgomery dropped Payne off at his house and left.
At noon Montgomery called Payne and told him Ward liked the sample and had ordered the money and that he was waiting to hear from Ward and would call back. Around 2:30 p.m. he called Payne and told him that everything was set to go. Payne said “that all Montgomery had to do was to come by his house and show him the money. Payne would then take Montgomery’s car and get the marijuana. At 4:50 p.m. Montgomery and Hart went to Payne’s house. They showed Payne $30,000, and he left in Montgomery’s car, saying he would be back within an hour. Payne returned around 6:00 p.m. without the marijuana. He told the detectives that appellant had been with him and was skeptical of the surveillance helicopter and black Corvette that had been following them. Payne said his people still wanted to do the deal but wanted to talk with Montgomery and Hart first. The officers then dropped Payne off at the Happy Times Bar.
Payne said he would call Montgomery at 7:00 p.m., which he did. He then told Montgomery that his people still wanted to talk to Montgomery that evening and that Montgomery did not have to bring any money or anything at that time. Montgomery and Hart were to meet them at the bar. Montgomery and Hart arrived at the bar at 7:40. Payne met them in the parking lot and told Montgomery that his man wanted to talk to him. Appellant came out of the bar, and Payne told Montgomery to go with appellant and Hart would ride with Payne to his house.
En route appellant told Montgomery that he did not want to do the deal in Pinellas County because of the trafficking laws and because of the surveillance helicopter and car he had seen earlier in the day. He suggested doing the deal in Manatee County. Montgomery was against this idea. Appellant also said that because of the trafficking statute he would not do one hundred pounds but would do ninety-nine pounds of marijuana. He also asked Montgomery if he liked cocaine. On the way appellant also pointed out an unmarked car from the sheriff’s department.
When appellant and Montgomery arrived at Payne’s house, Payne and Hart were already there. Inside, appellant said he was in a position to supply approximately fifteen people with ninety-nine pounds of marijuana every other day and that Payne would be involved in the deal. However, he and Payne then conferred together in a *1299 bedroom for five or ten minutes. When they returned, appellant announced that he was going to turn the deal over to Payne and that Payne was responsible for the deal but that, if the officers wished to wait until March 20, he would participate in the deal. Appellant also said he felt there was a possibility they might be police officers and asked to search them. Hart said he was carrying a gun, and appellant said he was not concerned about a gun but about a body bug. The officers refused to allow appellant to search them. Appellant then suggested that they go to Tampa International Airport and walk underneath the metal detector, which they also refused to do. There was no further discussion at that point. Appellant left, and then Montgomery and Hart left. Montgomery then called Payne at the bar as he had been instructed to do, and Payne said they could do the deal the following day.
Montgomery and Hart met Payne the following day pursuant to the arrangements, at which time they received ninety-nine pounds of marijuana and arrested Payne.
In none of his other transactions with Payne did Montgomery ever have any contact with appellant. Appellant had nothing to do with Montgomery’s first contact with Payne on March 18. When Payne left to get the sample that day, Montgomery had him tailed, and Payne went to codefendant Hudson’s house. Appellant said he would not participate in the deal on March 19 because he was not going to be in town. Montgomery verified that appellant was, indeed, out of town on March 19, and Montgomery knew of no way in which appellant had assisted Payne in the sale in question. Hudson apparently supplied the marijuana. After Payne’s arrest, Hudson telephoned Payne’s house. Another officer answered and said that the amount of marijuana delivered was less than the amount agreed upon, and Hudson said he would come over. He did and was arrested.
Detective Hart corroborated Montgomery’s testimony. He testified that Detective Ward talked to Hudson when Hudson called Payne’s home, but Hart called Hudson back and told him they had come up a little bit short on the deal. Hudson replied that they couldn’t be because he had put it up just before he sent it over.
Appellant testified that on the afternoon of March 18 when Payne came to pick him up, Payne was accompanied by a surveillance helicopter. Appellant assumed Payne was in the midst of a drug deal and pointed the helicopter out to him. He then asked Payne to drive the car to Tampa to give him an opportunity to search the car and to see if the helicopter would follow.
Appellant’s house was in Kenneth City, over seven miles from the location where Payne was when he told the detectives that the marijuana he was going to sell them was within a quarter mile radius.
Appellant told Payne that he thought the people Payne was dealing with were cops. At this point, appellant had done nothing to help Payne in a drug sale to these people; this was his first knowledge that Payne was trying to do a drug deal. That evening while appellant was drinking at the bar, Payne came in and told appellant that he was nervous about the sale and wanted to find out exactly who these people were. Appellant attempted to do so by making the demands Montgomery testified to. Appellant was thereby attempting to thwart the drug deal; he believed he could convince Payne of “who these people were.” When appellant went into the bedroom with Payne, he told Payne that the two men were deputies and that Payne was an absolute fool to go through with it. Appellant did not intend at this point or at any point afterward to participate in a drug sale to these two men. Appellant went to a motion hearing in federal court in Panama City on March 19. He attempted to postpone the deal in hopes of coming up with some information on the officers and explained to Payne that, if he wanted to do the deal, it was his responsibility and he would have to accept the consequences for it. Appellant denied participating in the sale in question. He did not intend to participate, was not to receive monetary com *1300 pensation for the deal, and was not the source of the marijuana.
On cross-examination of appellant, the state requested a bench conference and asked permission to inquire into the nature of the offense appellant had been convicted of on the ground that appellant had opened the door by bringing out on direct examination the fact that his conviction was on appeal. The trial court allowed the inquiry over defense objection, and it was brought out that appellant’s conviction was for smuggling over 1000 pounds of marijuana.
We conclude that the evidence was insufficient to support appellant’s conviction of attempted sale. If the transfer to the officers on March 19,1981, is treated as the basis of the conviction, all evidence indicates that appellant was not involved and that the source of the marijuana delivered by Payne was Hudson rather than appellant. If appellant’s offer to participate in the deal if it was delayed till March 20 is considered to be the attempted sale, no overt act was shown to have been done in furtherance of appellant’s intent. Such an act, which must go beyond mere preparation, is an essential element of the crime of attempt. Adams v. Murphy, 394 So.2d 411 (Fla.1981).
The evidence being insufficient to support appellant’s conviction, we must reverse and remand for discharge of appellant. However, for the edification of the trial bench and bar, we will address the issue of whether defense counsel opened the door to inquiry into the nature of appellant’s prior conviction. We hold that defense counsel did not open the door by bringing out that the prior conviction was on appeal. Section 90.610(2), Florida Statutes (1981), which provides that the penden-cy of an appeal does not render evidence of the conviction from which the appeal was taken inadmissible, goes on to add that evidence of the pendency of the appeal is admissible. The mere fact that defense counsel went beyond (very slightly) eliciting the bare fact and number of appellant’s prior convictions did not give the state carte blanche to delve into the specifics of appellant’s prior offense. One “opens the door” to an otherwise proscribed area or topic by asking questions relating to that area. See Leonard v. State, 386 So.2d 51 (Fla. 2d DCA 1980); Dodson v. State, 356 So.2d 878 (Fla. 3d DCA), cert. denied, 360 So.2d 1248 (Fla.1978). Appellant’s mentioning that his conviction was being appealed was not an attempt to mislead the jury. Compare Dodson. Thus, the trial court erred in allowing improper impeachment of appellant by the state. This error was, of course, prejudicial given the nature of the prior conviction and the offenses for which appellant was on trial, and this error alone would have compelled reversal here.
Because the evidence was insufficient to support appellant’s conviction we REVERSE that conviction and REMAND the case to the trial court with directions to discharge appellant.
GRIMES and LEHAN, JJ., concur.